UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                                                     Chapter 11

       Prime Hotel Management LLC              Case no.  18-10221

                       Debtor.
---------------------------------------------------------x

## OBJECTION EXCLUSIVITY EXTENSION

DS 17 West 24th Street Note Purchaser LLC (the "Mortgagee"), the holder of the first mortgage on the property (the "Secured Claim") owned by Prime Hotel Management LLC (the "Debtor") at 17 West 24th Street, New York, New York 10010 (the "Property"), as and for its objection to the Debtor's motion to extend is exclusive periods to file a plan of reorganization (the "Exclusive Filing Period") and to solicit acceptances thereof (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusive Periods") respectfully states as follows:

(a) **The value of the Property to the Debtor's estate has decreased during this case due to the Debtor's refusal to renew its lapsed approval of hotel building permits, and more significantly, due to the Debtor's failure to commence a sale process soon after filing;**

(b) **The Debtor's plan is illusory – it is based on a <u>nonexistent</u> agreement by the Mortgagee to a limited carve out for unsecured creditors and an unlimited carve out for administrative professionals and priority creditors;**

(c) **Although the Mortgagee intends to propose carve outs under a secured creditor plan, the Mortgagee made it quite clear that given the Debtor's failure to preserve the Property value since filing this case, coupled with the Debtor's refusal to meet with the Mortgagee until ordered to by the court, the Mortgagee will not pay for a plan process controlled by the Debtor;**

(d) **There was no equity in the Property when this case was filed, and there is even less now, so it makes no sense to permit the Debtor equity owner to hold the Property hostage by extending exclusivity – rather the Court should terminate exclusivity and permit those with a stake in the outcome to control the process.**

## BACKGROUND

1. On January 30, 2018, the Debtor filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. "101 et seq. (the "Bankruptcy Code").

2. The Debtor owns the real property pictured below at 17 West 24th Street, New York, New York 10010.



3.      The Property consists of a 26' x 97.75 ' parcel on which a vacant five-story building presently stands.  The Debtor's schedules indicate a $8,700,000 value. The Mortgagee estimates a value of about $12,000,000 as of the fall of 2017 based on marketing at that time.

4.      As of early April, 2018, the face amount of the Mortgagee's claim is about $11,800,000 plus late fees. The Debtor's Petition indicates $100,457 due for real estate taxes, and a $480,000 judgment lien, which was likely preferential and will be recharacterized as an unsecured claim.

5.      The Debtor scheduled $2,772,333 of general unsecured claims. Assuming the $480,000 judgment lien is recharacterized, general unsecured claims will total $3,252,333.

6.      Based upon the Mortgagee's projected Property value as of the fall of 2017, there would probably have been substantial funds to be distributed to unsecured creditors after paying real estate taxes and the Mortgagee's Secured Claim, had the Debtor proposed a sale when this case was commenced.

7.      The Debtor's pre-petition goal was to tear down the existing structure and build a hotel. The Debtor stated in Bankruptcy Court filings that it filed this case because it could not raise the necessary funds for development. The development scheme failed in 2016. The Debtor has been unable to find replacement financing, an equity investment, or a buyer since then. Meanwhile, the Mortgagee's claim is accruing interest at a 24% default rate. The Property has no income. Bills for debt service, water, electricity, real estate taxes and insurance went unpaid pre-petition, and the pattern continues, in part, post-petition.

**(a) The value of the Property to the Debtor's estate has decreased during this case, due to the Debtor's refusal to renew its lapsed hotel building permits, and more significantly, due to the Debtor's failure to commence a sale process soon after filing**

8.      Both the Mortgagee and 1724 Associates, LLC ("1724 Associates"), an unsecured creditor with a $2,505,417 claim, have maintained that the Debtor must sell the Property to stop the bleeding and preserve value for creditors. Because of the Mortgagee's dominance of the secured class of creditors, and 1724 Associates' dominance of the unsecured class, it has never been possible for the Debtor to confirm a plan without the consent of these parties, and the Mortgagee's agreement to subsidize plan payments. But until a Court hearing on April 17, 2018, the Debtor's principal refused to meet to put a sale and plan process in motion. Default interest has continued to accrue making sale prospects more remote.

9.      In addition, the Debtor's hotel development has been dormant so long that its plans and approvals expired. The Mortgagee discovered that the City of New York was making new rules that eliminate the as of right hotel use. The Debtor had to file documents and pay a filing fee to preserve its authorization to build a hotel before the new rules were enacted. But again, the Debtor refused to meet with the Mortgagee, and 1724 Associates to discuss the situation. Since the Debtor would not meet, the Mortgagee resorted to a written request (with 1724 Associates' support) that the Debtor accept up to a $200,000 protective advance to immediately reinstate its approvals. The Debtor refused.

10.     After the Court ordered the Debtor to meet with the Mortgagee and 1274 Associates, the Debtor agreed to the advance on or about May 3, 2018.

11. By then it was too late.

12. The day after the court ordered meeting, the proposed amendments to the zoning resolution were announced. They mandate a special permit for new hotels with (a) no approved building permit as of April 23, 2018, or (b) a finished foundation by the time the amendments are effective, estimated to be August 2018. Both options are now impossible. The Debtor's failure to maintain its building permits on its own, or to timely accept the Mortgagee's offer to loan the Debtor the money to do so, undermined the Property value to potential purchasers, and to estate creditors.

13. This is not inadvertent. The Debtor's principal has done nothing since filing this case to indicate that he shares the Mortgagee's sense of urgency, either regarding the hotel development option value, or the eroding equity in the Property as default interest accrues every day.

14. From the start, the Debtor rejected the Mortgagee's recommended strategy of proceeding with a sale while also searching for new investors. This, although the Mortgagee brought to the Debtor's attention the fact that in late March, the Debtor's lead potential investor caused an entity he controls to file a bankruptcy in this Court after defaulting on an unrelated real property purchase. The Debtor continued to insist on first looking for investors and then proposing a sale.

**(b)    The Debtor's plan is illusory – it is based on a nonexistent agreement by the Mortgagee to a limited carve out for unsecured creditors and an unlimited carve out for administration and priority creditors**

15.    Although it is no longer possible to preserve the hotel development option, a sale must still be put in motion forthwith to finally stop default interest accrual.

16.    The Mortgagee has maintained an ongoing dialogue with 1724 Associates. Both agree that the Debtor can't be trusted to effectuate a sale. This agreement results from the Debtor's principal's refusal to sell sooner, or even to meet to hear creditor arguments for a sale and for maintaining hotel building permits.

17.    Confidence in the Debtor's management was further undermined at the 341 meeting when the Debtor's principal answered virtually no questions. Mr. Lee is Korean so there may have been a language barrier, but the U.S. Trustee could not elicit answers even using Mr. Lee's bilingual "right hand man" as a translator.

18.    The Mortgagee and 1724 Associates agreed that the Mortgagee should move forward with a Mortgagee Plan. At the April 17, 2018 status conference, the Court ordered the Debtor to meet with the Mortgagee and 1724 Associates. The Debtor's management was silent. The Debtor communicates with the Mortgagee only through counsel. The parties could not agree on how to proceed.

19.    On the last possible day to avoid automatic stay relief under section 362(d)(3) of the Bankruptcy Code, the Debtor proposed a plan, but contrary to section 362(d)(3), there is no reasonable possibility that the plan can be confirmed.

20. The Plan provides for a sale of the Property under sale procedures to be disclosed under an unfiled separate application to the Court and by a broker to be named.

21. The Plan provides for two options.

22. If the sale proceeds will pay all real estate taxes, administration claims, priority creditors and the Mortgagee in full, the Debtor will sell to that purchaser. In that event unsecured creditors would receive no distribution unless the sale proceeds also produce a surplus. But the sale proceeds likely will not cover the Mortgagee's ever-growing claim, let alone administrative and subordinate creditors.

23. The second option is based on a consensual sale to the Mortgagee for a credit bid amount to be agreed to by the parties. Upon such sale, the Mortgagee must pay all administrative and priority claims plus a carve out in an amount to be determined for unsecured creditors. The Plan also requires the Mortgagee to transfer its claim to any third party who pays an amount to be determined. But the Debtor filed the plan *without* the Mortgagee's consent, so the plan is illusory. The Mortgage has consented to no discount under a Debtor sponsored plan. Nor has the Mortgagee agreed to credit bid and pay creditors as proposed under a plan the Debtor controls. Nor has the Mortgagee agreed to sell its note and mortgage.

**(c)  Although the Mortgagee intends to propose carve outs under a secured creditor plan, the Mortgagee made it quite clear that given the Debtor's failure to preserve the Property value since filing this case, coupled with the Debtor's refusal to meet with the Mortgagee until ordered to by the court, the Mortgagee will not pay for a plan process controlled by the Debtor**

24.  The Mortgagee will proceed with its own liquidating plan as set forth in its motion to terminate exclusivity, but the Mortgagee is unwilling to pay for a Debtor-controlled process at this late date, having suffered the consequences of the Debtor's failure to propose a sale at the outset, failure to authorize hotel building plan renewal and failure to communicate with creditors except through counsel. It is an invitation to delay and coercion.

25.  Indeed, more than two weeks after filing its plan, the Debtor has neither scheduled a hearing on its disclosure statement nor moved to approve sale terms nor moved to retain a mutually acceptable broker. And hidden in the plan is a poison pill that permits the Debtor to withdraw the plan at any time until it is confirmed. Since the Debtor's equity holder gets nothing under the plan, he has no skin in the game. He has nothing to lose by biding his time and then threatening to withdraw the plan unless he benefits personally.

26.  The better way to sell the property is under a secured creditor plan under which the Mortgagee will voluntarily reduce its claim and carve out for senior claims and a means for distribution to unsecured creditors. A Mortgagee plan can effectuate the result the Debtor ostensibly seeks without concern over the Debtor's principal's antipathy to a sale unless he benefits personally.

27. Permitting the Debtor to monopolize the process will continue to delay the process until no sale under any plan is feasible and then the only alternative is stay relief.

**(d)  There was no equity in the Property when this case was filed, and there is even less now, so it makes no sense to permit the Debtor equity owner to hold the Property hostage by extending exclusivity – rather the Court should terminate exclusivity and permit those with a stake in the outcome to control the sale and plan process.**

28. Section 1121 of the Bankruptcy Code limits the period during which a debtor has the exclusive right to file a plan of reorganization and solicit acceptances thereof to 120 and 180 days, respectively. See 11 U.S.C. § 1121(b)-(c). Once these initial periods expire, a debtor may only extend its exclusive periods upon showing "cause" for such an extension. *See* 11 U.S.C. § 1121(d); *see also In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) ("The debtor must make a clear showing of 'cause' to support an extension of the exclusivity period."). "[A] request to either extend or reduce the period of exclusivity is a serious matter" and "should be granted neither routinely nor cavalierly." *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990) (internal quotations and citation omitted); *In re Parker St. Florist & Garden Ctr., Inc.*, 31 B.R. 206, 207 (Bankr. D. Mass. 1983) ("[T]he Court should not routinely grant an extension."); *Curry Corp.*, 148 B.R. at 756 ("This court will not routinely extend the exclusivity period absent a showing of 'cause' when creditors object to such requests for extensions.").

29. In considering a request to extend a debtor's exclusivity period, "the court needs to consider more than just the articulated cause" and "must also consider the history and purpose of § 1121 and the competing interests which Congress sought to balance when it enacted

9

these time tables." *All Seasons Indus.*, 121 B.R. at 1004. *See also Curry Corp.*, 148 B.R. at 755 ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.") (*quoting In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), aff'd, 484 U.S. 365 (1988)); *Timbers of Inwood*, 808 F.2d at 372 ("[A]ny bankruptcy court involved in an assessment of whether 'cause' exists should be mindful of the legislative goal behind § 1121", which "represents a congressional acknowledgment that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise."); *All Seasons Indus.*, 121 B.R. at 1006 (denying debtors' exclusivity motion after finding that "such an extension would have the result of continuing to hold creditors hostage to the Chapter 11 process and pressuring them into accepting a plan they believe to be unsatisfactory").

30. While the Bankruptcy Code does not define what constitutes "cause," courts generally consider various factors to determine whether cause exists to extend a debtor's exclusivity periods, including: "(1) the size and complexity of the case; (2) the necessity of sufficient time to negotiate and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) whether the debtor is paying its debts as they come due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiating with creditors; (7) the length of time the case has been pending; (8) whether the debtor is seeking the extension to pressure creditors; and (9) whether unresolved contingencies exist." *Collier on Bankruptcy* ¶ 1121.06[2] (16th Ed. 2015).

31.     Here, the relevant factors weigh against granting an extension of the Debtor's Exclusive Periods. First, the Debtor has no ongoing business operations. Its assets will be sold. It has no business to restructure. Size and complexity does not support granting an extension.

32.     Second, until ordered by the Court, the Debtor intentionally excluded the Mortgagee and 1724 Associates, the two principal stakeholders from discussions of a sale under a plan. The Debtor's refusal to meet on the sale process, not to mention maintaining its hotel building permit, precluded negotiations and "good faith progress" towards a plan.

33.     Third, the Debtor cannot pay its bills as they come due. Nothing has been paid towards debt service or real estate taxes since the case commenced. Default interest continues to accrue.

34.     Fourth, the Debtor has not met its burden in demonstrating reasonable prospects for proposing a viable plan. The Debtor's plan is contingent on a settlement with the Mortgagee that does not exist. Absent a settlement the plan is not feasible.

35.     Fifth, the Debtor is trying to use exclusivity to force a plan upon the Mortgagee that it must subsidize, but to which it objects. This is a calculated effort to hold the Property hostage to allow the Debtor to force a resolution on the Mortgagee and should be denied.

## **CONCLUSION**

WHEREFORE, the Mortgagee respectfully requests that this Court enter orders denying the Debtor's motion to extend exclusivity, grant the Mortgagee motion to terminate exclusivity, and grant such other and further relief as this Court deems just and proper.

Dated: New York, New York
      May 10, 2018

                              **BACKENROTH FRANKEL & KRINSKY, LLP**
                              Attorneys for the Mortgagee

                By:    s/Mark A. Frankel
                         800 Third Avenue
                         New York, New York 10022
                         (212) 593-1100